# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2010-AN-01050-SCT

## CONSOLIDATED WITH

## NO. 2010-AN-01999-SCT

*IN THE MATTER OF THE ENLARGING,*
*EXTENDING AND DEFINING THE CORPORATE*
*LIMITS AND BOUNDARIES OF THE CITY OF*
*BILOXI, HARRISON COUNTY, MISSISSIPPI:*
*CITY OF D'IBERVILLE, MISSISSIPPI*

*v.*

*CITY OF BILOXI, MISSISSIPPI AND HARRISON*
*COUNTY, MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 05/21/2010 |
| TRIAL JUDGE: | HON. THOMAS L. ZEBERT |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | JERRY L. MILLS |
| | JOHN PRESTON SCANLON |
| | W. FRED HORNSBY, III |
| | WALTER L. NIXON, JR. |
| ATTORNEYS FOR APPELLEES: | J. CHADWICK MASK |
| | JAMES L. CARROLL |
| | CLIFTON MICHAEL DECKER |
| | RONALD G. PERESICH |
| | GINA BARDWELL TOMPKINS |
| | TIM C. HOLLEMAN |
| | PATRICK TAYLOR GUILD |
| NATURE OF THE CASE: | CIVIL - MUNICIPAL BOUNDARIES & ANNEXATION |
| DISPOSITION: | AFFIRMED - 03/21/2013 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**KING, JUSTICE, FOR THE COURT:**

¶1. In this case consolidating the competing annexation petitions of Biloxi and D'Iberville, the chancellor ultimately awarded each city a reduced area from that requested. He determined that it was unreasonable for either city to annex the entire area requested, and then determined that it was reasonable to award each city a smaller, reduced area. Both cities appeal this decision, and Biloxi raises jurisdictional issues for the first time on appeal. Because Biloxi is raising personal jurisdiction on behalf of third parties, and because Biloxi failed to raise this issue at the trial-court level, we find that Biloxi not only lacks standing to raise this issue, it also waived it. Further, because the chancellor's decision awarding each city a reduced area is reasonable and supported by substantial evidence, we affirm the annexations as modified by the chancellor.

## FACTS AND PROCEDURAL HISTORY

¶2. On August 17, 2007, the City of Biloxi filed a petition to enlarge its boundaries via annexation of approximately 11.2 square miles of Harrison County, the Proposed Annexation Area ("PAA"). Biloxi's City Council had passed its ordinance authorizing the same on August 7, 2007. D'Iberville filed its petition to enlarge its boundaries via annexation of essentially the same area on September 12, 2007, pursuant to an August 21, 2007, ordinance of its City Council. Harrison County objected to both petitions. All of the Harrison County chancellors recused themselves, and in November 2007, this Court appointed Thomas Zebert as Special Judge to preside over the case. The cases were consolidated on November 8, 2007. A scheduling order was entered on June 6, 2008, ordering the parties to "file all

dispositive motions and motions challenging jurisdiction by June 16, 2008." The court held the trial over twenty-three nonconsecutive days from May to September 2009.

¶3.    The chancellor, in a comprehensive 133-page opinion, divided the PAA into three pieces.  He found that it was not reasonable for either city to annex the entire PAA, thus leaving a portion to remain as unincorporated Harrison County.  He concluded that "such property excluded by the Court is unreasonable and is not required by public convenience and necessity and therefore is excluded."  Of the remaining area, the chancellor essentially divided it in half, giving Biloxi an area adjacent to Biloxi (deemed the "Biloxi Critical Area"), and giving D'Iberville an area adjacent to it (referred to hereinafter as the D'Iberville Annexation Area, or "DAA").  The DAA includes the new D'Iberville High School.  Each city received approximately 2.5 square miles.  The chancellor determined that each city needed this land because, among other reasons, Hurricane Katrina "caused a tremendous loss of usable real estate both in Biloxi and D'Iberville."  He concluded that both municipalities "have proven by the totality of the circumstances by analyzing the testimony, viewing the property in question and finding that each municipality has successfully proven the degree of reasonableness necessary and that such proof was credible to reflect that the public convenience as a necessity will be served by such granting of the PAA as reduced by the court."

¶4.    D'Iberville appeals, arguing that it was unreasonable to award Biloxi any of the area, and that the chancellor should have awarded the entire PAA to D'Iberville.  Biloxi cross-appeals, arguing that the chancellor should have awarded the entire PAA to Biloxi, and also raising for the first time the issue that the trial court lacked jurisdiction over D'Iberville's

3

petition due to inadequate proof it had satisfied its statutory publication requirement. Harrison County does not appeal, and asks this Court to affirm the chancellor's ultimate determination.

## ANALYSIS

### I. Standard of Review

¶5.    "Annexation is a legislative affair.  The judicial function is limited to the question of whether the annexation is reasonable."[1]  *City of Jackson v. Byram Incorporators*, 16 So. 3d 662, 683 (Miss. 2009) (internal quotations and alterations omitted).  The only determinations that the court has the power to make are whether the annexation is reasonable or unreasonable and whether it should be reduced.  *Id.*  This Court reviews the chancellor's determination of reasonableness for manifest error.  *Id.* at 682-83.  This Court will reverse only where the chancellor applies an incorrect legal standard, is manifestly wrong, or his findings are not supported by substantial evidence.  *Id.* at 682.  "Even where the credible evidence is conflicting, this Court will not reverse unless the chancellor's findings are

---

[1]Statute provides that the chancellor is to approve the annexation if he finds from the evidence that it "is reasonable and is required by the public convenience and necessity." Miss. Code Ann. § 21-1-33 (Rev. 2007).  As it relates to the municipality, the determination of public convenience and necessity is legislative.  *See In re Extension of the Boundaries of the City of Meridian*, 115 So. 2d 323, 328 (Miss. 1959); *In re Extension of Boundaries of City of Brookhaven*, 65 So. 2d 832, 833 (Miss. 1953).  "The adoption of the ordinance is itself a finding of public necessity and convenience by the governing authorities."  *City of Jackson v. Town of Flowood*, 331 So. 2d 909, 911 (Miss. 1976).  Further, "[i]n determining 'reasonableness,' the court must consider the proposal in light of the area as a whole, considering the concern of both the city and the landowners."  *In re Extension of Corp. Boundaries of the Town of Mantachie*, 685 So. 2d 724, 727 (Miss. 1996).  Thus, a determination of reasonableness necessarily encompasses an analysis of the public necessity and convenience of an annexation.

4

manifestly wrong." *Id.* at 682-83 (internal quotations omitted); *see also In re Enlargement and Extension of the Municipal Boundaries of the City of D'Iberville*, 867 So. 2d 241, 248 (Miss. 2004) (noting that "[f]indings of fact made in the context of conflicting, credible evidence may not be disturbed unless this Court can say that from all the evidence that such findings are manifestly wrong, given the weight of the evidence." (internal quotations omitted)).

¶6.     To annex territory, a municipality must adopt an ordinance regarding its desired enlargement.  Miss. Code Ann. § 21-1-27 (Rev. 2007).  It must then file a petition in chancery court, and when a hearing is set on such petition, it must give notice of the hearing to interested parties by posting, publication, and personal service.  Miss. Code Ann. §§ 21-1-15, 21-1-29, 21-1-31 (Rev. 2007).  The municipality then bears the burden at trial of proving that its proposed annexation is reasonable.  Miss. Code Ann. § 21-1-33 (Rev. 2007).

## II. Jurisdiction

¶7.     Jurisdiction is a question of law, and we review it de novo. *In re M.I.*, 85 So. 3d 856, 857 (Miss. 2012).

¶8.     Biloxi argues for the first time on appeal that D'Iberville did not provide proper *proof* of publication, thus, the chancery court lacked jurisdiction over D'Iberville's annexation petition. D'Iberville argues that Biloxi waived this issue by failing to raise it at the trial-court level and in accordance with the court's scheduling order and that notice by publication was actually accomplished, as D'Iberville had made the simple mistake of filing the wrong proof of publication with the trial court.  D'Iberville attaches the correct proof of publication to its reply brief, but Biloxi contends that this Court cannot consider it, as it is outside the record.

5

¶9. Upon filing a petition to enlarge its boundaries and upon the court setting a hearing on the petition, a municipality must give notice of the hearing pursuant to Section 21-1-15 of the Mississippi Code. Miss. Code Ann. § 21-1-31 (Rev. 2007). The required notice includes notice by publication, posting, and personal service. Miss. Code Ann. § 21-1-15 (Rev. 2007). Notice by publication of the hearing must be made "in some newspaper published or having a general circulation in the territory proposed to be [annexed] once each week for three consecutive weeks." Miss. Code Ann. § 21-1-15 (Rev. 2007). "The first publication of such notice . . . shall be made at least thirty days prior to the day fixed for the hearing of said petition, and such notice shall contain a full description of the territory proposed to be [annexed]." *Id.* This notice is in lieu of personal service. ***Myrick v. Incorporation of a Designated Area into a Mun. Corp. To Be Named Stringer***, 336 So. 2d 209, 210 (Miss. 1976).

¶10. In annexation cases, notice is classified as jurisdictional, and thus may generally be raised for the first time on appeal. ***In re Enlargement and Extension of Mun. Boundaries of City of Clinton***, 920 So. 2d 452, 455 (Miss. 2006). Failure to give proper notice may deprive the chancery court of jurisdiction. *Id.* at 456. Statutory guidance regarding proof of proper notice does not exist, thus, this Court relies on Rule 4 of the Mississippi Rules of Civil Procedure. *Id.* "This Court takes seriously proof of proper notice." *Id.* The record should contain such proof of proper notice. ***Norwood v. Extension of Boundaries of City of Itta Bena***, 788 So. 2d 747, 751 (Miss. 2001).

¶11. Rule 4 of the Mississippi Rules of Civil Procedure, upon which this Court relies in determining adequate proof of notice, provides that "[f]ailure to make proof of service does

6

not affect the validity of the service." M.R.C.P. 4(f); *In re Extension of Corp. Boundaries of the Town of Mantachie*, 685 So. 2d 724, 726 (Miss. 1996). While Biloxi correctly notes that this Court cannot consider matters outside the record,[2] it notably does not argue that notice by publication was not achieved. Rather, it argues that the proper *proof* was not garnered at trial. Biloxi implicitly admits that D'Iberville did properly publish, but merely argues its proof of such publication was deficient. Thus, failure to make proof of service does not necessarily invalidate D'Iberville's proper notice by publication. However, as noted, this Court does take proof of notice very seriously, thus we will further address Biloxi's jurisdictional arguments, especially given the argument that notice involves subject matter jurisdiction and the need to clarify jurisdictional issues surrounding annexation cases.

¶12.     Biloxi argues that the jurisdictional requirement of notice is one of subject matter jurisdiction, thus lack of notice is capable of divesting this Court of jurisdiction.[3] D'Iberville asserts that it is a matter of personal jurisdiction, which may be waived.[4] It also argues that Biloxi is improperly asserting notice arguments on behalf of third parties, which it does not have standing to do, given that Biloxi itself was properly served. This Court has recognized that matters of notice in annexation proceedings achieve personal, not subject matter, jurisdiction. *See Extension of Boundaries of City of Tupelo v. City of Tupelo*, 94 So. 3d 256, 265 (Miss. 2012) ("the chancery court obtained personal jurisdiction over the parties

---

[2]M.R.A.P. 10.

[3]*See Esco v. Scott*, 735 So. 2d 1002, 1006 (Miss. 1999) ("subject matter jurisdiction may not be waived and may be asserted an any stage of the proceeding").

[4]*See Jones v. Chandler*, 592 So. 2d 966, 970 (Miss. 1991) ("objections to personal jurisdiction must be asserted timely or they will be held waived").

7

once statutory notice was complied with"); *Myrick*, 336 So. 2d at 210 (acknowledging that notice is in lieu of personal service). The trial court indisputably had personal jurisdiction over Biloxi, as it was properly served via the process outlined in the statute. Thus, any claim of lack of *proof* of notice of publication belongs to third-party objectors, those to whom notice by publication is directed. It is improper for Biloxi to raise the rights of third parties. *See In re Enlargement, Extension of Mun. Boundaries of City of Horn Lake*, 822 So. 2d 253 (Miss. 2002). Biloxi lacks standing to make their arguments.

¶13. Additionally, given that this is an issue of personal jurisdiction, not subject matter jurisdiction, it is certainly an issue that, under certain narrow circumstances, may be waived, even in an annexation case. In this case, Biloxi, as a party to the litigation, had ample opportunities over a period of approximately three years to raise the jurisdictional issue with the chancellor. It was subject to a scheduling order that specifically mandated when jurisdictional issues must be raised. Given Biloxi's failure to raise this issue for the many years it has been a party to this case, the chancellor went so far as to note in his opinion that "no jurisdictional questions were raised during the course of trial."

¶14. Trial courts have a right to expect compliance with their scheduling orders, "and when parties and/or attorneys fail to adhere to the provisions of these orders, they should be prepared to do so at their own peril." *Bowie v. Montfort Jones Mem'l Hosp.*, 861 So. 2d 1037, 1042 (Miss. 2003). "[L]itigants must understand that there is an obligation to timely comply with the orders of our trial courts. . . . 'At some point the train must leave.'" *Id.* at 1043 (quoting *Guaranty Nat'l Ins. Co. v. Pittman*, 501 So. 2d 377 (Miss. 1987)). Biloxi failed to raise a lack of proof of notice at the trial court and pursuant to the scheduling order,

8

despite years of opportunities to do so. Only after the final result did not comport with Biloxi's desired outcome did it raise the notice issue. Clearly, allowing such a strategy could create perverse incentives and a massive waste of judicial resources. Because Biloxi failed to raise this issue with the trial court during years of extensive participation in the case, it waived this argument. *See Jones*, 592 So. 2d at 970. Notice under the annexation statutes is a matter of personal, not subject matter, jurisdiction, thus the failure to *prove* notice does not automatically mandate dismissal for want of jurisdiction, particularly under the facts of this case, where notice was properly provided. In so holding, we do not diminish the import of a municipality providing proper proof of notice in the chancery court. We merely hold, under the specific facts of this particular case, that the failure to do so does not automatically deprive the chancery court, or this Court, of jurisdiction.

### III. Reasonableness of Annexations

¶15. This Court has enumerated twelve factors, or indicia, to determine the reasonableness of an annexation. *City of Jackson*, 16 So. 3d at 683. Several of the factors utilize "subfactors" or "subindicia" in their analysis. *See id.* at 683-692.[5] "The twelve indicia are not separate and distinct tests in and of themselves." *Id.* at 683 (internal quotations and alterations omitted). Rather, "the chancellor must consider all twelve of these factors and determine whether under the totality of the circumstances the annexation is reasonable." *Id.* (internal quotations and alterations omitted). Two cities' competing interests in the same

---

[5]This Court has repeatedly emphasized that the lists of "subindicia" are not exhaustive, "nor is it required that each factor be present in order for an annexation to be reasonable." *City of D'Iberville*, 867 So. 2d at 253, 254, 255, 256. Rather, the subindicia merely provide guidance. *Id.*

9

area of land are "considered under one or more of the indicia and, certainly, when looking at the totality of the circumstances." *City of D'Iberville*, 867 So. 2d at 251. Furthermore, the chancellor has the authority to reduce the area sought to be annexed. *Id.* at 248.

¶16.    The twelve factors for determining reasonableness are: (1) the municipality's need for expansion; (2) whether the area subject to annexation is reasonably within a path of growth of the municipality; (3) the potential health hazards from sewage and waste disposal in the annexed areas; (4) the municipality's financial ability to make the improvements and furnish municipal services promised; (5) the need for zoning and overall planning in the area; (6) the need for municipal services in the area; (7) the existence of natural barriers between the municipality and the proposed annexation area; (8) the past performance and time element involved in the municipality's provision of services to its present residents; (9) the economic or other impact of the annexation on those who live in or own property in the proposed annexation area; (10) the impact of the annexation upon the voting strength of protected minority groups; (11) whether property owners and other inhabitants of the proposed annexation area have in the past, and for the foreseeable future unless annexed, will enjoy the economic and social benefits of proximity to the municipality without paying their fair share of the taxes; and (12) any other factors that may suggest reasonableness *vel non*. *City of Jackson*, 16 So. 3d at 683. In his opinion and order, the chancellor evaluated each of these twelve factors.

## 1. The Need for Expansion

¶17.    Courts may examine twelve "subfactors" to determine whether a municipality has a need for expansion. *City of Jackson*, 16 So. 3d at 683-84. These "subfactors" are: (a)

spillover development into the proposed annexation area; (b) the municipality's internal growth; (c) the municipality's population growth; (d) the municipality's need for development land; (e) the need for planning in the proposed annexation area; (f) increased traffic counts; (g) the need to maintain and expand the municipality's tax base; (h) limitations due to geography and surrounding cities; (i) remaining vacant land within the municipality; (j) environmental influences; (k) the municipality's need to exercise control over the proposed annexation area; and (l) increased new building permit activity. *Id.* The chancellor found that Biloxi has a need to expand into the Biloxi Critical Area, a need that was heightened due to Hurricane Katrina. He likewise found that D'Iberville had a similar need to expand into the DAA.

### a. Spillover Development

¶18. The chancellor took note of Mike Slaughter's testimony that much of the development in the PAA was a direct result of employment and recreational opportunities in Biloxi. He also found that the proposed Pinehaven development was partially in Biloxi and partially within the Biloxi Critical Area. The chancellor found that, to a "small degree," the PAA's development spilled over from D'Iberville, noting that D'Iberville has worked cooperatively with developers in the PAA and has made substantial investments in the PAA, including providing utility services to developments. Thus, he ultimately determined that both cities have spillover development into the reduced PAA, from both business and subdivisions.

¶19. D'Iberville argues that the chancellor improperly relied on Mike Slaughter's testimony that there was spillover from Biloxi to the Biloxi Critical Area because Slaughter testified on cross-examination that the spillover was not direct, but that growth in the PAA

11

was there because of Biloxi and its proximity. D'Iberville continues that a substantial amount of spillover was from D'Iberville. It points to the fact that D'Iberville serves 666 customers in the area with water and sewer, that the new D'Iberville High School is located within the PAA, and that two major developers work with D'Iberville in developing land. Biloxi argues that the chancellor's finding that Biloxi had spillover into the PAA was supported by the testimony of Slaughter and was exemplified by the proposed Pinehaven development.

¶20.    D'Iberville's apparent argument that spillover must be direct is unavailing. While direct spillover may be the clearest example of spillover, spillover may also refer to development in the PAA for which a city is a catalyst. *See* ***City of Macon***, 854 So. 2d at 1036 (noting spillover where internal growth and a lack of room within the city were causing growth, including the openings of a multitude of businesses, directly outside the city); *see also* ***Extending, Enlarging and Defining Corp. Limits and Boundaries of City of Horn Lake v. Town of Walls***, 57 So. 3d 1253, 1260 (Miss. 2011) (referring to expert testimony that "spillover" may have different meanings). Even faced with arguably conflicting credible evidence, it does not appear that the chancellor manifestly erred in finding spillover development from Biloxi into the Biloxi Critical Area and from D'Iberville into the DAA.

*b. Internal Growth*

¶21.    The chancellor combined the internal growth analysis with that of increased new building permit activity, noting that building permit data "provides an empirical measurement of whether or not a municipality is experiencing internal growth." He found that Biloxi had seen an increase in the issuance of permits from 222 in 2000 to 696 in 2007 and 501 in 2008,

12

and had issued a total of 11,840 permits since 2004. He also pointed to evidence of subdivisions platted since Hurricane Katrina, indicating continuous internal growth within Biloxi. He further found that Biloxi's growth south of Interstate 10 ("I-10") was limited due to constraints resulting from Hurricane Katrina, thus shifting Biloxi's growth inland. The chancellor also noted that D'Iberville has a new major shopping center and hundreds of new residential units under construction, which reflect internal growth.

¶22. The chancellor concluded that Biloxi's population is projected to increase, and it is growing internally. D'Iberville also demonstrated current and projected future growth.

¶23. D'Iberville maintains that there is no credible evidence of substantial subdivision growth in Biloxi, and that most of the subdivision growth consisted of small two- and three-lot subdivisions. D'Iberville then argues that it has experienced substantial internal growth, as noted by the chancellor, thus the chancellor should have found that annexation by D'Iberville of the entire PAA was reasonable. Biloxi argues that 423 of 443 new single family lots platted since Katrina were within "major subdivisions."

¶24. D'Iberville's argument regarding subdivisions is unavailing, as the chancellor also relied heavily on the evidence of new building permits granted by Biloxi. The chancellor's finding that both cities have experienced internal growth is supported by substantial evidence.

*c. Population Growth*

¶25. The chancellor noted that Biloxi's population in 2000 was 50,644, that its estimated 2010 population is 45,670, and that Hurricane Katrina destroyed 5,034 residential structures in 2005. The chancellor found that citizens displaced by Hurricane Katrina were returning

13

to Biloxi to some degree, and that they were often not rebuilding at their old home sites because it was cost-prohibitive. The chancellor also found that Biloxi's population density was high, estimated at 1,144 persons per square mile. The chancellor emphasized that Biloxi's decrease in population was largely due to Hurricane Katrina, that people were returning, and that people were not inclined to rebuild south of I-10, supporting Biloxi's annexation despite its population decrease. He further emphasized Biloxi's high population density. The chancellor found that D'Iberville's population has grown from 6,566 in 1990 to 7,423 in 2007, and was estimated to be 10,263 by the end of 2009. He found that the fact that D'Iberville's population increased at all in light of Hurricane Katrina indicated growth, even though its total population increase was only slight.

¶26.	The chancellor noted that he considered the evidence and estimates presented by D'Iberville that Biloxi's population decreased both pre-Katrina and post-Katrina, and further that he considered Harrison County's contention that Biloxi's population decreased and D'Iberville had experienced only a very small population growth.

¶27.	D'Iberville argues that Biloxi's population would have decreased from the 1990s to 2000 had it not annexed a very large area in 1999. It maintains that Biloxi's population was in decline in the years leading up to Hurricane Katrina and has further declined post-Katrina. D'Iberville emphasizes that Biloxi has a significant out-migration trend, and that out-migration outpaces natural population increase. It argues that the total population also would have had a downward trend but for annexations. D'Iberville then argues that its population has substantially increased, despite Hurricane Katrina, thus this factor favors D'Iberville's annexation of the entire PAA. Biloxi emphasized its high population density, the fact that

14

most municipalities along the Gulf Coast experienced population decrease post-Katrina, and the chancellor's finding that residents are returning and rebuilding post-Katrina.

¶28. This Court has found annexation of a limited area reasonable even when a city's population is in decline, where the population density is very high and could be alleviated with annexation. *City of Jackson*, 16 So. 3d at 684-85. Thus, the chancellor did not manifestly err in finding annexation of limited areas by each city reasonable with regard to population.

*d. Need for Development Land*

¶29. The chancellor emphasized throughout his analysis that Biloxi was in desperate need of land to develop, particularly because Hurricane Katrina had "jettisoned" Biloxi's growth from south of I-10 to north of I-10. The chancellor noted that two studies on Biloxi's vacant land were performed, one finding 14.1% vacant land and the other finding 26% vacant land. *See, infra* ¶ 48. The chancellor noted that D'Iberville's land had growth constraints similar to those in Biloxi – flood inundation areas, insurance costs, and reconstruction costs. He also found that ownership and location constraints on land existed in D'Iberville.

¶30. The chancellor concluded that both cities had similar constraints on current vacant land. He found that this factor favored D'Iberville, but in so noting, stated that he was "not find[ing] that there is not an existent need for Biloxi to have developable land." In fact, he noted that Biloxi had a very low percentage of vacant, unconstrained land, at 14.1%, "well below the levels previously determined by the Supreme Court to be supportive of a municipality's need to expand." He further determined that Biloxi had a tremendous amount of construction activity occurring, as evinced by issued building permits, and further noted

15

Biloxi's very dense population density as supporting its need to expand. He concluded that both cities are now experiencing sufficient growth to support annexation.

¶31.   D'Iberville contends that the Supreme Court cases regarding vacant land cited by the chancellor led the chancellor to an incorrect conclusion because the percentages cited actually represented *total* vacant land, not *developable* vacant land.  It further argues that the 14.1% figure relied upon by the chancellor was incorrect, as the data was erroneous.  It argues that on cross-examination, Mike Slaughter, who made the 14.1% vacant land calculation, admitted to multiple mistakes in the calculation of the percentage of vacant land in Biloxi.  D'Iberville continues that Biloxi does not have a need for additional vacant land. D'Iberville then argues that, because the chancellor found that this factor favors D'Iberville, it thus favors D'Iberville's annexation of the entire PAA.

¶32.   "This Court refuses to set a limit on the vacant land available and has approved annexations when there has been as much as 59% usable vacant land available to an area." *City of Jackson*, 16 So. 3d at 684.  Furthermore, the chancellor noted that "minor errors" in Slaughter's calculations existed, were considered by the court, and were not outcome-determinative.  Certainly, even the higher percentage of 26% vacant usable land in Biloxi supports a finding of reasonableness of annexation, especially when considered in conjunction with other factors regarding the need for land discussed by the chancellor.  Thus, the chancellor did not manifestly err in his findings on this subfactor.

*e. Need for Planning in PAA*

¶33.   Several witnesses testified that the PAA was in need of planning and zoning.  Mike Slaughter specifically testified to several zoning and code enforcement issues in the PAA,

16

such as narrow roads, poorly maintained sidewalks, unfenced swimming pools, and illegal dumping, among others. Further, the proposed Pinehaven development, situated partially within Biloxi and partially within the Biloxi Critical Area, was being developed under potentially inconsistent zoning ordinances. The chancellor noted that if D'Iberville were to annex the Biloxi Critical Area, the proposed Pinehaven development would be under the jurisdiction of two different entities, and thus would continue to be subject to inconsistent zoning and development regulations. Regarding other areas of the PAA, the chancellor found that D'Iberville has a need to control development, particularly in regard to controlling connections to its water and sewer system, as unauthorized and uncoordinated connections exist.

¶34. The chancellor determined that the PAA in general is in need of planning, especially considering the increased urban development and the new Highway 67 corridor. He stated that "[t]he scope of planning needed within the [PAA] is not limited to that related to land development, but also includes planning for the delivery of the increasing need for services." However, the chancellor ultimately found that Harrison County provided a good level of planning and zoning in the PAA, and determined that this factor is thus neutral.

¶35. D'Iberville appears to agree with the chancellor's analysis that this factor is neutral, but it disagrees with his different assessment earlier in his opinion that there is a need for municipal-level planning and zoning in the PAA. D'Iberville opines that this finding is improper because it is "simply inconsistent" with his finding under the totality of circumstances. Biloxi emphasizes the chancellor's findings regarding Pinehaven.

17

¶36. Neither party disputes that an annexation by *some* municipality was proper. They merely dispute by which municipality it was proper. Thus, given that neither party disputes that annexation was proper, and the chancellor found that this factor was neutral and thus supports no annexation, the arguments attempting to paint the chancellor's findings as "inconsistent" are unavailing. The evidence shows that the county does provides some planning and zoning, but that it is also in some ways deficient. Thus, a finding of neutrality was not manifestly wrong. Furthermore, somewhat conflicting evidence on this one subfactor does not render the chancellor's determination under the totality of the circumstances manifestly wrong.

### *f. Increased Traffic Counts*

¶37. The chancellor found that the new Highway 67/15 corridor had significantly increased the daily traffic volume within the Biloxi Critical Area. He also noted that increased traffic would lead to the need for municipal-level police protection services, such as the use of radar. The chancellor ultimately concluded that "[t]here have been increased traffic counts at all locations measured by MDOT within the [PAA]."

¶38. D'Iberville agrees that there exists an increased traffic count, but maintains that limiting this finding to the Biloxi Critical Area was error, and that this factor is neutral or favors D'Iberville. Biloxi counters that "it makes no difference whether traffic counts are increasing within only the Biloxi Critical Area, or whether they are increasing throughout the entire PAA, as both support Biloxi's need to expand to include the Biloxi Critical Area."

¶39. The evidence shows increased traffic counts in the PAA, thus this subfactor supports the reasonableness of the chancellor's ultimate decision to award each city a limited area,

18

especially since the area annexed by Biloxi will include the Highway 67 corridor, which Biloxi demonstrated the capacity to patrol.

### g. Need to Maintain and Expand Tax Base

¶40. The chancellor found that Biloxi lost approximately 28% of its ad valorem tax base due to Hurricane Katrina. He further found that "rebuilding on much of the Biloxi peninsula [is] prohibitively expensive" due to new flood zones post-Katrina. Thus, "[a]s a result of Hurricane Katrina jettisoning growth north of I-10 within . . . Biloxi, it is imperative that the City be able to expand its boundaries into the Biloxi Critical Area in order to maintain its northward shifting tax base." The chancellor determined that D'Iberville also has a need to expand its tax base, but that the PAA would not significantly expand it in the immediate future. The chancellor took note of expert testimony that D'Iberville needed to expand along Highway 67, which is included in the Biloxi Critical Area, in order to support the type of development D'Iberville needs, but the chancellor ultimately disagreed with the expert's assessment.

¶41. The chancellor decided that both cities have a need to expand their tax base. Although he found that the PAA would not immediately expand either tax base substantially, he noted that developments, including the new Highway 67 corridor, would enhance commerce, business, and residential areas in the long-term.

¶42. D'Iberville argues that, because Biloxi is unlikely to fulfill its water and sewer promises to the PAA, the PAA will not expand Biloxi's tax base. It particularly emphasizes that the proposed Pinehaven development will not reach fruition without water and sewer. It argues that Biloxi should fulfill its commitments and developments within its existing

boundaries in order to raise its tax base. It further argues that D'Iberville needs more land to accommodate its growth. Thus, it reasons, this factor favors D'Iberville. Biloxi points out that the chancellor found that Biloxi's tax base has moved north, necessitating Biloxi's annexation northward. It also argues that D'Iberville's arguments regarding its failure to provide services are against the weight of the evidence.

¶43. The record supports the need for both cities to expand their tax bases in the long term, although the annexations are money-losing prospects in the short-term; thus this subfactor supports the reasonableness of the chancellor's determination to award each city a limited area.

### h. Geographical Limitations

¶44. The chancellor found that both municipalities' ability to expand is limited. Biloxi is limited by the cities of Ocean Springs and D'Iberville to the east, the city of Gulfport to the west, the Gulf of Mexico to the south, and partially by the DeSoto National Forest to the north. The chancellor also observed that post-Katrina changes in Biloxi's flood plain and floodway boundaries constrain its internal growth potential. The chancellor noted that D'Iberville is bordered by "Back Bay" and Biloxi to the south, Biloxi to the west, and Jackson County, the West Jackson County Utility District, and Ocean Springs to the east.

¶45. The chancellor concluded that both cities have limited growth opportunity due to geography, but that neither would have an "upper hand" if the court granted each the area as modified.

¶46. D'Iberville argues that the finding that Biloxi would have only two miles in which to squeeze northern growth is incorrect, as Biloxi would have four miles to the north in which

20

to expand under the conditions explained by the chancellor. It further contends that the findings regarding Gulfport's potential annexation are speculative and that D'Iberville had decided not to pursue an annexation that would have likewise restricted Biloxi's path of growth. Biloxi argues that the findings that its geography and growth are physically restricted were supported by substantial evidence, and emphasized that Biloxi can only grow to the north.

¶47. Regardless of whether Biloxi has two or four miles of northern growth, the record is clear that both cities' potential expansions are very restricted due to location. Thus, this subfactor supports the chancellor's decision to award each city a limited area.

*i. Municipality's Vacant Land*

¶48. The chancellor noted that two vacant land analyses were completed for Biloxi. The analysis performed by Wallace Roberts and Todd ("WRT") found that 26% of Biloxi's land was both "vacant and developable." The analysis performed by Mike Slaughter concluded that 14.1% of Biloxi's land was both "vacant and unconstrained." The chancellor determined that either percentage supported Biloxi's need to expand. The chancellor found that D'Iberville had constraints upon some of its vacant lands and had "very little vacant land within its present boundaries suitable to build on." He noted that the land rendered vacant by Hurricane Katrina is not expected to meet long-term growth demands.

¶49. D'Iberville contends that Biloxi does not have a need for additional vacant land. It also argues that this factor favors D'Iberville because the chancellor found that D'Iberville had more of a need. Biloxi argues that, despite D'Iberville's argument that the chancellor improperly relied on Slaughter's calculation, even WRT's calculation that Biloxi had 26%

21

vacant land was supportive of Biloxi's annexation. It further argues that D'Iberville's "land absorption" argument failed to take into account post-Katrina land absorption trends.

¶50. "This Court refuses to set a limit on the vacant land available and has approved annexations when there has been as much as 59% usable vacant land available to an area." *City of Jackson*, 16 So. 3d at 684. Certainly, even the higher percentage of 26% vacant usable land in Biloxi supports a finding of reasonableness of annexation. The chancellor also found that D'Iberville has very little vacant land. Thus, the chancellor's decision to award each city a limited area is supported by substantial evidence on this "subfactor."

*j. Environmental Influences*

¶51. The chancellor emphasized that environmental constraints on Biloxi's land post-Katrina, especially the fact that of much of the Biloxi peninsula was reclassified as a flood zone, demonstrated a need for Biloxi to expand. The chancellor noted that D'Iberville had many of the same environmental issues as Biloxi. The chancellor concluded that both cities are subject to heightened environmental constraints and influences, such as flood plains, wetlands, and severe slopes, due to their proximity to the Gulf of Mexico.

¶52. D'Iberville argues that the environmental constraints and influences cited by the chancellor do not indicate that Biloxi needs to expand its borders, as Biloxi has sufficient existing land on which to develop. D'Iberville then argues that the sewer problems and health hazards found to exist within the PAA are environmental issues that D'Iberville can better address, thus this factor favors D'Iberville. Biloxi emphasizes the environmental factors as a result of Hurricane Katrina that now restrict its growth and argues that the chancellor's findings are supported by credible evidence.

22

¶53. It is plain that environmental factors, particularly post-Katrina factors, contribute to both cities' need to expand, as shown by the record. Thus, the chancellor's findings regarding this "subfactor" are supported by substantial evidence.

*k. City's Need for Control Over PAA*

¶54. The chancellor found that as the fringe of Biloxi urbanizes, it is important that the fringe does so under Biloxi's zoning and codes. The chancellor pointed to the expansive proposed Pinehaven development and the need to construct the development under uniform zoning and development regulations. He further pointed out that the methods of sewer and waste disposal in the Biloxi Critical Area posed health hazards to the citizens of Biloxi, and that Biloxi needed to exert control over waste management to protect its citizens from residual harm. The chancellor noted similar concerns over expanding urbanization and health hazards for D'Iberville.

¶55. D'Iberville argues that the chancellor made inconsistent findings on this factor, finding both that Harrison County provides a good level of planning and zoning, and that Biloxi needs to control the area. It maintains that Biloxi does not have the same need as D'Iberville to control the area, because Biloxi has not extended utilities into the area as has D'Iberville, nor has it built roads, nor are there any special circumstances supporting Biloxi's need to control the area other than the area needing a "good level of municipal planning and zoning." It contends that D'Iberville has a need to control its water and sewer connections in the PAA. D'Iberville concludes that the PAA needs improved waste disposal, "but this does not lead to a leap in reasoning that Biloxi must be the municipality to exert control over

23

the PAA." Biloxi maintains that D'Iberville has not extended any utilities into the Biloxi Critical Area. It contends that the chancellor's findings on this issue were correct.

¶56. The record is clear that some issues exist in the PAA that would benefit from municipal control. However, the chancellor indicated that Harrison County's provision of services and planning is not seriously lacking. "Even where the credible evidence is conflicting, this Court will not reverse unless the chancellor's findings are manifestly wrong." *City of Jackson*, 16 So. 3d at 682-83. Furthermore, awarding D'Iberville the DAA does indeed assist D'Iberville in controlling its utility connections. D'Iberville does not require annexation of the entire PAA at this time to exercise adequate control. Despite somewhat conflicting evidence surrounding this "subfactor," the chancellor did not manifestly err in his determination to award a limited area to each city.

*l. Increased New Building Permit Activity*

¶57. The chancellor found that Biloxi had seen an increase in the issuance of permits from 222 in 2000 to 696 in 2007 and 501 in 2008, and had issued a total of 11,840 permits since 2004, with a total value of over $1.4 billion. This evinces a "tremendous amount of construction activity" in Biloxi since 2000. The chancellor ultimately found that both cities have recently had and will continue to have requests for new building permits at such a level to render expanding reasonable.

¶58. D'Iberville contends that Biloxi's increased building permit activity is not an indicator of a need for expansion, as much of the activity is "likely" Hurricane Katrina recovery. It also points to major developments by two developers who have relied upon D'Iberville for water and sewer, as well as the new D'Iberville High School located in the PAA and served

24

with water and sewer from D'Iberville. Biloxi points to the major subdivisions platted since Hurricane Katrina, and notes that its number of pre-Katrina building permits was high.

¶59. Given the chancellor's findings that it is cost prohibitive and otherwise difficult to build south of I-10 post-Katrina, even if the building permit activity is indicative of Katrina recovery, it supports expansion. Further, D'Iberville does not point to any evidence supporting its contention that the building activity is "likely" Katrina recovery. Additionally, the DAA includes the new D'Iberville High School, and much of the area to which D'Iberville provides utilities, thus the argument that D'Iberville requires the entire PAA to address these issues is unavailing. The chancellor's findings on this "subfactor" that both cities have increased building permits, indicative of growth, support his award of a limited area to each city.

¶60. Overall, substantial evidence supports both cities' need for expansion, and the chancellor's decision to reduce the area granted to each city is not manifestly wrong, given the current needs of each city.

### 2. Path of Growth

¶61. The Court examines seven "subfactors" to determine whether the PAA is reasonably within the municipality's path of growth: (a) spillover development in the proposed annexation area; (b) whether the proposed annexation area is immediately adjacent to the municipality; (c) limited area available for the municipality's expansion; (d) interconnection between the municipality and the proposed annexation area by transportation corridors; (e) increased urban development in the proposed annexation area; (f) geography; and (g) subdivision development. *City of Jackson*, 16 So. 3d at 685. "The most important factors

25

in determining the reasonableness of path of growth are adjacency of the [PAA] to the City, accessibility of the [PAA] by City streets, and spillover of urban development into the [PAA]." ***In re Enlargement and Extension of Boundaries of City of Macon***, 854 So. 2d 1029, 1037 (Miss. 2003).

¶62.    D'Iberville claims that the chancellor made conflicting findings on this issue, finding that the PAA both was and was not in the path of growth of Biloxi and D'Iberville. The chancellor does not appear to have made conflicting findings. Biloxi argues that only Biloxi demonstrated that the *entire* PAA is within its path of growth.   It further argues that the Biloxi Critical Area is not within D'Iberville's path of growth, as it has no spillover from D'Iberville, no D'Iberville city streets extending into it, and no D'Iberville water or sewer service.

### a. Spillover Development

¶63.    The chancellor relied on expert testimony that much of the development in the PAA was a direct result of employment and recreational opportunities in Biloxi.  He also found that the proposed Pinehaven development was partially in Biloxi and partially in the Biloxi Critical Area, and that other subdivisions extend directly out of Biloxi into the Biloxi Critical Area. The chancellor found that the Biloxi Critical Area was not experiencing any spillover from D'Iberville.  The chancellor further found spillover from D'Iberville into the DAA.

¶64.    D'Iberville argues that the chancellor improperly relied on Mike Slaughter's testimony that there was spillover from Biloxi to the Biloxi Critical Area because Slaughter testified on cross-examination that the spillover was not direct, but that growth in the PAA was present because of Biloxi and its proximity.  Biloxi argues that much of the growth in

26

the PAA is due to the growth of gaming in Biloxi. Biloxi also points to the Paradise Lane subdivision as evidence of direct spillover, as well as the Pinehaven development, and contends that no development within the Biloxi Critical Area is spillover from D'Iberville.

¶65. D'Iberville's argument that spillover must be direct is unavailing. *See* discussion, *supra* ¶ 20. Even faced with arguably conflicting credible evidence, the chancellor did not manifestly err in finding spillover development from Biloxi into the Biloxi Critical Area and from D'Iberville into the DAA.

### b. PAA Immediately Adjacent to City

¶66. The chancellor found that the Biloxi Critical Area is immediately adjacent and contiguous to Biloxi. The maps in the record clearly illustrate that the DAA is adjacent to D'Iberville.

¶67. D'Iberville maintains that it takes more than adjacency and interconnecting streets to render annexation reasonable. Biloxi argues that D'Iberville has no interconnectivity to the Biloxi Critical Area, while it is adjacent to and interconnected with Biloxi.

¶68. It is abundantly clear from the record that the Biloxi Critical Area is immediately adjacent to Biloxi, and that the DAA is immediately adjacent to D'Iberville. This indicium supports the chancellor's award of a limited area to each city.

### c. Limited Expansion Area Available

¶69. The chancellor found that Biloxi had very limited available land resources, using Mike Slaughter's figure to note that Biloxi has only about 14% of its land classified as vacant and unconstrained. He pointed out that the flood zone boundaries in Biloxi were greatly

27

extended after Katrina, rendering much more of Biloxi's land expensive and difficult to use. He also found that D'Iberville had limited available land upon which to develop and expand.

¶70. D'Iberville argues that both cities are restricted by the Desoto National Forest and that Biloxi has growth opportunities to the northwest along the Highway 67 corridor. Biloxi reiterated that the chancellor's findings regarding Biloxi were supported by substantial and credible evidence.

¶71. The chancellor made thorough findings regarding the limits on the area into which Biloxi may expand, and likewise made similar findings regarding D'Iberville. Clearly, both cities are limited in potential growth areas both internally and externally. Thus, the chancellor's decision to award each city a reduced area is supported by substantial evidence of limited expansion area.

*d. Interconnection by Traffic Corridors*

¶72. The chancellor noted that several streets extend directly out of Biloxi and into the Biloxi Critical Area, including the new Highway 67 corridor. The chancellor found a "complete lack of interconnection" between the Biloxi Critical Area and D'Iberville, stating that no in-use D'Iberville city streets extended into the Biloxi Critical Area. He found this to be a significant indicator that the Biloxi Critical Area is not within D'Iberville's path of growth.

¶73. This factor certainly supports the chancellor's award of the Biloxi Critical Area to Biloxi and does not undermine the reasonableness of the chancellor's decision to award each city a reduced area.

*e. Increased Urban Development*

28

¶74. The chancellor discussed this factor in conjunction with subdivision development and noted that proposed and existing subdivisions extended from Biloxi into the Biloxi Critical Area. Further, he noted that the PAA population has increased nearly 80% since 2000, and that the proposed Pinehaven development that extends from Biloxi into the Biloxi Critical Area proposes to bring 7,245 new residents into the Biloxi Critical Area, which will greatly increase the area's urbanization. The chancellor also noted that D'Iberville had experienced population growth and increased business development.

¶75. D'Iberville claims that the only recent development in the Biloxi Critical Area is the construction of the D'Iberville Waste Water Treatment Plant, and that no recent subdivision development has occurred. Biloxi retorts that this argument ignores the proposed Pinehaven development and the post-Katrina growth trends.

¶76. While the record reveals that the present development in the Biloxi Critical Area is not of a large quantity or concentration, some development, actual and proposed, does exist. Further, several subdivisions exist in the DAA. Thus, the chancellor did not manifestly err in awarding limited areas to each city.

*f. Geography*

¶77. The chancellor found that Biloxi's ability to expand is severely limited. He noted that Biloxi is limited by the cities of Ocean Springs and D'Iberville to the east, the city of Gulfport to the west, the Gulf of Mexico to the south, and partially by the DeSoto National Forest to the north. The chancellor found D'Iberville similarly restricted in geography.

29

¶78. D'Iberville argues that the geography has not changed since this Court's 2004 decision that held that the PAA was not in Biloxi's path of growth. *See City of D'Iberville*, 867 So. 2d at 254.

¶79. D'Iberville's argument ignores the fact that Hurricane Katrina occurred since this Court's 2004 decision. The chancellor found that Biloxi's path of growth has shifted north, due to the new difficulties in building south of I-10. Indeed, this Court has acknowledged that Hurricane Katrina "jettisoned the growth of Harrison County from south of Interstate I-10 to north of Interstate I-10." *Edwards v. Harrison County Bd. of Supervisors*, 22 So. 3d 268, 276 (Miss. 2009). Thus, the chancellor did not manifestly err in finding that this "subfactor" supports Biloxi's annexation of the Biloxi Critical Area and D'Iberville's annexation of the DAA.

### g. Subdivision Development

¶80. The chancellor found that both existing and proposed subdivisions are present in the Biloxi Critical Area, some of which are partially located in Biloxi. Further, he noted that the proposed Pinehaven development requested water and sewer infrastructure from Biloxi.

¶81. D'Iberville argues that two of the subdivisions cited by the chancellor as indicative of Biloxi's path of growth were built out at the time of this Court's 2004 decision confirming the chancellor's decision that the PAA was not in Biloxi's path of growth. D'Iberville's argument again ignores the fact that Hurricane Katrina occurred since this Court's 2004 decision. The chancellor found that Biloxi's path of growth has moved north due to the difficulty of building south of I-10. Indeed, this Court has acknowledged that Hurricane Katrina "jettisoned the growth of Harrison County from south of Interstate I-10 to north of

Interstate I-10." ***Edwards***, 22 So. 3d at 276. Thus, the chancellor did not manifestly err in finding that this indicium supported Biloxi's annexation of the Biloxi Critical Area and D'Iberville's annexation of the DAA.

¶82. Overall, substantial evidence supports the chancellor's decision that the Biloxi Critical Area is in Biloxi's path of growth and the DAA is in D'Iberville's path of growth. Thus, the chancellor's ultimate determination to award each city a limited area is not manifestly wrong.

### 3. Health Hazards from Sewage and Waste Disposal

¶83. Courts may examine the following five factors to determine whether potential health hazards from sewage and waste disposal exist in the PAA: (a) potential health hazards from sewage and waste disposal; (b) a large number of septic tanks in the potential annexation area; (c) soil conditions that are not conducive to on-site septic systems; (d) open dumping of garbage; and (e) standing water and sewage. ***City of Jackson***, 16 So. 3d at 686. The chancellor found that potential health hazards exist in the PAA.

*a. Health Hazards*

¶84. The chancellor noted several health hazards in the PAA, including in the Biloxi Critical Area. He opined that "Biloxi has measures in place to address the potential health hazards existing in the Biloxi Critical Area." He pointed to Biloxi's two alternate plans to deliver sanitary sewer to the Biloxi Critical Area, and noted that Biloxi would be able to address other health hazards by enforcing its codes and regulations. The chancellor found that D'Iberville currently provides sewer service to 666 of the 1096 potential users in the PAA.

31

¶85.   The chancellor determined, and both cities agree, that there are widespread health hazards in the PAA.  He found that, while Biloxi made a commitment to provide water and sewer to the PAA, that commitment is "not as strong as the commitment of D'Iberville."  He also noted that Biloxi had been remiss in some of the promises made in prior annexation cases, finding that it had 3,300 unserved customers in the Woolmarket area.  He concluded that D'Iberville had the better plan to address the issues and that it had already addressed health issues within its current limits.  He called this factor the "biggest constraint on development in Biloxi."

¶86.   D'Iberville notes that most of the health hazards in the PAA are from septic tank use and that D'Iberville is working to reduce septic tanks in the area by providing the PAA with central water and sewer, while Biloxi does not provide the PAA with any central water or sewer.

*b. Number of Septic Tanks*

¶87.   The chancellor noted that no portion of the Biloxi Critical Area is serviced by sanitary sewer service, thus residents must rely on septic tanks.  He also relied on expert testimony stating that "less than 15% of people relying on on-site sewage systems maintain their systems properly."  The chancellor found that the PAA as a whole contains 439 units without central sewer. D'Iberville's plan serves all 439 within the first five years after annexation, while D'Iberville claims that Biloxi's plan only serves thirty-five.

*c. Soil Conditions*

32

¶88.    The chancellor found that soil conditions throughout the PAA are not conducive to the use of on-site septic systems for raw sewage disposal and that this factor "generally" supports the reasonableness of annexation.

*d. Open Dumping of Garbage*

¶89.    Expert testimony and photographs established open dumping of garbage throughout the PAA.  "Abandoned cars, abandoned trailers, discarded tires, discarded appliances, and illegal dump piles . . . can be found through out [sic] the entire PAA, including the Biloxi Critical Area."  The chancellor found that this factor weighs equally in favor of both cities, as there is a problem and both cities have programs in place to address the issue.

*e. Standing Water and Sewage*

¶90.    Direct discharge of raw sewage onto the ground was identified as a widespread and hazardous situation within the PAA.  Biloxi's plan for the PAA commits to providing partial coverage to address this problem in the first five years after annexation.  D'Iberville's plan for sewer service provides coverage in the first five years after annexation. The chancellor found that the two cities' plans had differences in timing, costs, legal ability to serve, and rate structure.

¶91.    D'Iberville argues that the chancellor's findings on this factor are "self-contradictory," as Biloxi has a poor record in this regard and the chancellor found that D'Iberville had the better plan to address the issues.  It also claims that Biloxi's plan does not contain a plan specific to the Biloxi Critical Area. Biloxi argues that the facts supporting its annexation of the Biloxi Critical Area also support its annexation of the entire PAA.

¶92. Jim Weston of the Mississippi Department of Health testified at length, confirming the existence of potential health hazards found in the PAA. *See City of D'Iberville*, 867 So. 2d at 255 (Jim Weston "confirmed that potential health hazards exist in the PAA."). Both cities provided plans to address the health hazards. The chancellor did find that Biloxi's commitment to addressing the health hazards was not as strong as D'Iberville's. Certainly, substantial evidence supports the chancellor's decision to reduce the area desired by each city, and to grant each a limited area. Health hazards exist that the cities can address, but neither city should be overwhelmed with having to address more commitments than it can adequately handle.

### 4. Financial Ability to Make Improvements and Furnish Services

¶93. A court may consider seven "subfactors" in determining whether a municipality has the financial ability to provide municipal services to the PAA. *City of Jackson*, 16 So. 3d at 686. The "subfactors" are: (a) the municipality's present financial condition; (b) sales tax revenue history; (c) recent equipment purchases; (d) the financial plan and department reports proposed for implementing and fiscally carrying out the annexation; (e) fund balances; (f) bonding capacity; and (g) expected amount of revenue from taxes in the proposed annexation area. *Id.*

¶94. The chancellor found that Biloxi had the financial capability to pay for promised improvements and services in the entire PAA, and thus within the Biloxi Critical Area. He noted that Biloxi would lose money with regard to the PAA for the first five years, but that it had the capacity to absorb that deficit without an adverse impact on Biloxi's financial

34

condition as a whole. He likewise found that D'Iberville has the financial ability to provide municipal services to the PAA.

¶95. D'Iberville "concede[s] that Biloxi has the power to raise taxes and fees to generate the money necessary to provide services and make improvements in the 'critical area[]' . . . because there is essentially nothing there to serve." D'Iberville sees the lack of specificity of Biloxi's plans for the Biloxi Critical Area as fatal. D'Iberville makes much of the notion that the only plan offered by Biloxi was for the entire PAA. Biloxi counters that this argument is unrealistic, because, while the chancellor is entitled to reduce the award of an area to Biloxi from that which Biloxi requested, "there was no way of knowing what area the Chancellor would actually award either city until the Chancellor issued his Opinion." D'Iberville also claims that during trial, "it became apparent that Biloxi's financial position weakened." It then argues that D'Iberville has the financial ability to provide municipal services to the PAA, thus this indicium favors awarding D'Iberville the entire PAA. Biloxi asserts that D'Iberville lacks the financial ability or manpower to annex the PAA. It claims that the number of police officers and fire fighters that will need to be added to D'Iberville's forces to service the PAA is cost-prohibitive. Biloxi argues that its finances and manpower are better equipped to handle annexation and deliver services to the PAA "on the first day following annexation."

*a. Present Financial Condition*

¶96. The chancellor found Biloxi's fiscal health to be strong. He pointed to the fund balance, as well as the ad valorem tax collections. He relied on evidence that Biloxi's ad valorem tax collection was rebounding after Hurricane Katrina, noting that it was $8,700,000

35

pre-Katrina, $6,700,000 in 2006, and $7,700,000 in 2008. Thus, he concluded, Biloxi has a healthy and significant revenue stream. He also noted that Biloxi's assessed value has been on an upward trend after a post-Katrina dip in 2006, when the tax roll fell to $389,000,000. The 2008 tax roll showed an assessed value of $580,000,000, even higher than the 2004 and 2005 pre-Katrina assessed values. The chancellor further found that Biloxi had a low tax levy of 30.1 mills and very low water, sewer, and garbage rates, with water and sewer rates amounting to approximately half that charged by D'Iberville. He also took note of Biloxi's budget for fiscal year 2010, noting that year-to-date revenue was 4% higher than budgeted, and year-to-date expenditures were 10% under budget. The chancellor did note that the Biloxi mayor had vetoed many city council actions based on uncertainty in Biloxi's financial outlook and a need to enhance revenue to eliminate its deficit. The chancellor also found that D'Iberville is financially viable and healthy, and that it had seen substantial increases in its assessed valuation and in retail sales. He noted thriving economic development despite the nationwide economic recession.

*b. Sales Tax Revenue History*

¶97.  The chancellor found that Biloxi had a healthy revenue stream from sales tax diversions, and noted that the city's sales tax diversions were rebounding post-Katrina. In 2005, the sales tax diversion was $12,700,00. It was $9,624,239 post-Katrina, $11,344,568 in 2008, and projected to exceed pre-Katrina levels by 2013. Further, in 2008, Biloxi's gaming tax revenues amounted to $22,293,685, which exceeded pre-Katrina revenues. The chancellor noted a substantial increase in retail sales in D'Iberville. He stated that

36

D'Iberville's sales tax collections were projected to be $5,754,604 by 2010, noting a substantial increase over 2004 levels.

### c. Recent Equipment Purchases

¶98. The chancellor noted that between September 1, 2005, and February 25, 2009, Biloxi purchased $16,250,000 in vehicles and equipment. He relied on expert testimony that the post-Katrina replacement of destroyed equipment indicates Biloxi's financial ability and its ability to provide services throughout the PAA, and within the Biloxi Critical Area.

### d. Proposed Financial Plan

¶99. The chancellor took note of the detailed plan for Biloxi's proposals for the PAA. "The plan details the personnel and equipment needed by each of the City's departments to implement the City's proposed annexation" so that the residents of the PAA receive the same level of services Biloxi is currently providing within the city. It also assesses the projected financial condition of Biloxi, after annexation of the PAA. The chancellor found that Biloxi will "remain in strong financial condition if it annexes only the Biloxi Critical Area." He generally reviewed Biloxi's plans for police and fire protection, public works, and zoning enforcement. He noted that he believed that the total PAA was "too aggressive" for Biloxi to handle, and that reducing Biloxi's annexation to the smaller Biloxi Critical Area gave Biloxi an easier financial and planning burden to bear. The chancellor also relied upon D'Iberville's detailed financial plan.

¶100. The chancellor rebuffed Biloxi's argument that D'Iberville did not have the financial ability to provide the same level of services as Biloxi, under a "bigger is better" argument.

He found that D'Iberville had the financial ability to provide D'Iberville municipal services to the PAA, and that nothing Biloxi offered showed that those services are insufficient.

*e. Fund Balances*

¶101. The chancellor found that Biloxi's general fund balance as of September 2009 was $21,500,000. Its operating fund balance was $54,000,000. The chancellor found that D'Iberville had grown its fund balance from slightly over $1,000,000 to $8,200,000 over a five-year analysis period, and that its fund balance was equivalent to 92.9% of its general fund financial obligations. Projections showed the city maintaining healthy fund balances.

*f. Bonding Capacity*

¶102. The chancellor found that Biloxi had numerous bonding options available to it, if necessary. He also found that in 2008, Biloxi had a debt capacity of $56,228,144 under the 15% Rule and $76,334,654 under the 20% rule, and that future projections indicated the debt capacity would only increase. He also noted that the debt capacity was "excellent evidence that the City does not have any excessive debt and is in sound fiscal condition." The chancellor found that D'Iberville's bonding capacity was more than $12,000,000 under the 15% rule. He noted that annexation would increase that to $14,000,000 and that in five years, it will have more than $16,000,000. Under the 20% rule, D'Iberville has nearly $11,000,000 of bonding capacity in 2010, and will have more than $18,000,000 in five years.

*g. Expected Tax Revenue from PAA*

¶103. The chancellor noted that Biloxi's annexation of the Biloxi Critical Area would be a money-losing proposition in the short-term. The chancellor likewise found that the costs of

the annexation would outweigh D'Iberville's revenues from the annexation in the short-term, but that the financial health of the city could support this deficit.

¶104. The chancellor considered detailed financial information for both cities. He found both cities were financially healthy, a finding the record supports. He did note that, financially, annexation of the entire PAA was "too aggressive" for Biloxi. This factor certainly supports awarding each city a reduced area, as the chancellor's findings are supported by substantial evidence.

### 5. Need for Zoning and Planning

¶105. The chancellor found that the PAA had unmet planning and zoning needs that Biloxi was capable of satisfying. He relied on evidence that the PAA "has pervasive zoning deficiency issues such as narrow public roads and streets; streets with standing water or without adequate drainage structures; street erosion; dead end streets without turnarounds; and buckled sidewalks." He found that Biloxi's Community Development Department, as it relates to planning, zoning, and code enforcement, is well-staffed and capable of handling issues arising in the Biloxi Critical Area. He also noted that the proposed Pinehaven development is subject to irregular zoning ordinances, which would be resolved by Biloxi's annexation of the Biloxi Critical Area. However, the chancellor ultimately found this factor to be neutral, determining that "Harrison County presently provides a good level of municipal planning and zoning in the PAA."

¶106. D'Iberville argues that the chancellor made inconsistent findings on this issue, finding both that Harrison County provided a good level of municipal planning and zoning in the PAA and that the PAA needed planning and zoning. It contends that the finding that this

factor is neutral is indeed correct, and that it is consistent with the finding in the 2004 case. *See City of D'Iberville*, 867 So. 2d at 256. Biloxi acknowledges that Harrison County has certain planning and zoning measures, but points out that certain unmet planning and zoning needs exist within the PAA. Biloxi also argues that adopting the 2004 finding would be flawed, because it ignores both the new proposed Pinehaven development and the impact of Hurricane Katrina. Biloxi further contends that D'Iberville does not have the personnel to provide and enforce municipal level planning and zoning, especially in light of the increasing urbanization of the PAA.

¶107. Whether this factor favors one city or is neutral, it certainly does not render the chancellor's decision manifestly wrong when viewed under the totality of the circumstances. Further, when faced with conflicting credible evidence, this Court will not reverse unless the chancellor is manifestly wrong. It is clear from the evidence that, while Harrison County might provide sufficient planning and zoning, the area could also benefit from municipal-level planning and zoning. Thus, the chancellor's decision to grant each city a reduced area is not manifestly wrong under this indicium.

### 6. Need for Municipal Services

¶108. A trial court may examine the following seven "subfactors" in determining whether the PAA has a need for municipal services: (a) requests for water and sewage services; (b) the municipality's plan to provide first-response fire protection; (c) adequacy of the existing fire protection; (d) the municipality's plan to provide police protection; (e) the municipality's plan to provide increased solid waste collection; (f) the use of septic tanks in the proposed annexation area; and (g) population density. *City of Jackson*, 16 So. 3d at 687.

40

¶109.  The chancellor deduced that there is a need for municipal services in the PAA.  The

chancellor found that Biloxi showed the willingness and ability to address the need for these

municipal-level services in the Biloxi Critical area and the PAA as a whole, and that it has

affirmed its commitment to providing the same, thus concluded that this factor weighs in

favor of Biloxi's annexation of the Biloxi Critical Area.  He further found that D'Iberville

was likewise capable of providing the municipal services needed in the area.

### a. Requests for Water and Sewage Services

¶110.  The chancellor found that the proposed Pinehaven development requested that Biloxi

deliver it water and sewer.  However, he noted Biloxi's poor past performance in this area,

and the fact that no evidence existed that Biloxi issued the Pinehaven developers a "will

serve" letter. The chancellor found that D'Iberville had received requests for water and sewer

services, and had issued "will serve" letters in response to a number of these requests.

However, D'Iberville has not extended any water or sewer into the Biloxi Critical Area.

### b. Plan to Provide Fire Protection

¶111.  At the time of trial, Biloxi's fire protection was classified as Class Five,[6] with Class

One being the best and Class Ten being the worst.  Biloxi proposed building a $1,000,000

fire station with twelve additional fire fighters to staff it to serve the PAA.  However, Biloxi

already has sufficient staff and equipment to service only the Biloxi Critical Area without

having to add stations or personnel.  Further, Biloxi has four ladder trucks that could provide

---

[6]The chancellor refers to Biloxi's "Class 5" and "Class 4" fire rating interchangeably in his opinion.  The record reveals that Biloxi's fire class improved after trial, and that Biloxi and D'Iberville argued whether the improvement was appropriate to include in the ultimate findings of fact.

41

services to the proposed high-rise hotel and condominiums within the proposed Pinehaven development. The chancellor found that Biloxi also offers fire prevention services, such as fire drills at schools, fire evacuation classes at businesses, provision and installation of smoke detectors free of charge, and business inspection, and that Biloxi proposes to extend these services to the Biloxi Critical Area. The chancellor found that D'Iberville has a plan to provide first-response fire protection, which includes new fire stations. D'Iberville's fire department was rated a Class Six as of trial.

¶112. The chancellor found that Biloxi's Class Five rating and D'Iberville's Class Six rating would have the same impact on homeowners' insurance. He also noted that it appeared that the cities' fire ratings were under review at the time of trial.

¶113. D'Iberville argues that Biloxi does not have a plan to provide fire service specifically to the Biloxi Critical Area. Biloxi argues that just because it would not be required to add a new fire station if it were awarded only the reduced area does not mean that it would not commit to providing its services to that area. It noted that an award of a reduced area may logically require less personnel or equipment to extend services into that area.

### c. Adequacy of Existing Fire Protection

¶114. The PAA is served by a primarily volunteer fire department that is rated a Class Eight. Evidence showed that volunteer fire departments "cannot provide the high-level of fire protection and prevention services which a full-time municipal fire department . . . is able to provide." The chancellor relied on expert testimony that the PAA needs a full-time, professional, paid fire department, considering the amount of current urbanization and projected future growth in the PAA.

### d. Plan to Provide Police Protection

¶115. Harrison County currently provides .66 officers per thousand persons. The chancellor found a need for a higher level of police protection in the PAA to deter crime and enforce traffic laws, in part due to a pervasive speeding problem in the PAA, as well as frequent property crimes. Biloxi provides municipal-level law enforcement at a level of 2.96 officers per thousand persons. The chancellor noted that Biloxi was committed to delivering the same high-quality police protection, which includes specialized services such as a bomb squad and dive team, to the Biloxi Critical Area as it presently provides within the city. Further, Biloxi will bring in a more regular patrol and the ability to enforce speed limits. The chancellor also found that D'Iberville has a plan to provide police protection to the PAA, and can provide a higher level of routine patrol than that provided at present. D'Iberville also has the capability to use radar to control speed.

### e. Plan to Provide Solid Waste Collection

¶116. The chancellor found that Biloxi, D'Iberville, and Harrison County provide the same manner of garbage collection. However, he noted that Biloxi and D'Iberville additionally provide trash collection of goods larger than those picked up by standard garbage collection, a service that Harrison County does not provide. He opined that the enhanced level of trash collection would benefit the PAA, as evinced by photographs of illegal dumping piles throughout the area.

### f. Use of Septic Tanks

¶117. The chancellor found that septic tanks were in use throughout the PAA, as discussed, *supra ¶ 85*, and that soil conditions were not conducive to the use of septic tanks for sewage

43

disposal. He found that Biloxi provided a reasonable plan to provide sanitary sewer to existing and proposed developments within the Biloxi Critical Area within five years of annexation. However, when considering the entire PAA, the chancellor stated that Biloxi's plan would address fewer than forty of the 469 septic tanks within five years. The chancellor took note of D'Iberville's five-year plan to serve sewer. The chancellor opined that D'Iberville's plan to eliminate septic tanks is more extensive than Biloxi's.

### g. Population Density

¶118. The chancellor found that the PAA's population had increased nearly 80% from 2000 to 2008. He also found that the proposed Pinehaven development would further increase population density.

¶119. D'Iberville argues that virtually none of the PAA's population increase occurred in the Biloxi Critical Area. It further argues that the chancellor found that much of the increase in population density is attributable to D'Iberville's provision of services to the area, thus, it maintains that this indicium favors D'Iberville. Biloxi maintains that the chancellor also considered proposed developments and post-Katrina growth trends, as well as the new Highway 67 corridor, in weighing this indicium.

¶120. The chancellor reviewed a myriad of plans and facts under this indicium. The record indicates that the reduced area is in need of municipal-level services and that both cities could provide adequate municipal-level services. Further, given the location of the requests upon each city for water and sewer, and the location of D'Iberville's provision of such services, the chancellor's decision awarding each city a limited area is not manifest error.

44

He awarded D'Iberville much of the area for which it provides water and sewer services, and Biloxi the area from which it had received water and sewer service requests.

### 7. Natural Barriers

¶121. The chancellor found that natural barriers were not an issue in either city's annexation. The chancellor thus found this to be a neutral factor, as no natural barriers impact the reasonableness of either annexation.

¶122. The finding that this factor is neutral does not render the chancellor's award manifestly wrong such that the entire area should be awarded to either D'Iberville or Biloxi. The chancellor's decision that this factor is neutral is supported by substantial evidence,

### 8. City's Provision of Services to Present Residents

¶123. This indicium is evaluated by examining "the municipality's performance in previous annexations and whether it has provided promised services to its residents." *City of Jackson*, 16 So. 3d at 689 (internal quotations omitted).

¶124. The chancellor determined that Biloxi had an overall good record of past performance in previously annexed areas, with a few very troubling exceptions. The chancellor thoroughly examined Biloxi's most recent annexations, the 1999 "Woolmarket Annexation" and the 2004 "Wells Ferry Annexation." In the Woolmarket annexation, Biloxi promised to provide residents with the full range of municipal services, including police protection, court services, animal control, school guard services, fire protection and prevention, emergency medical services, emergency preparedness and civil defense services, engineering, street and structural maintenance, right-of-way maintenance, traffic systems maintenance, storm water drainage maintenance, street lighting, sanitation services, access

45

to cultural facilities, services, and programs, access to social service programs, access to parks and recreational facilities and programs, water and sewer services at in-city rates, municipal planning and zoning, and municipal code enforcement and building inspection. Biloxi further promised to construct and equip three fire stations, acquire and interconnect certificated water and sewer utilities, make water and sewer improvements, construct a one-million-gallon water tank with a well, and construct several park facilities. The chancellor found that most of these many promises were timely kept and that Biloxi regularly spends more money providing services to the Woolmarket area than it collects in taxes from the area.

¶125. However, the chancellor detailed Biloxi's failure to provide water and sewer to the area, and declined to accept Hurricane Katrina as an excuse, given that Hurricane Katrina occurred more than six years after the date of annexation, clearly outside of the five year time period in which Biloxi was to complete the majority of the projects. He noted that one of the factors that favored annexation of the Woolmarket area was Biloxi's contention that severe health hazards, such as standing raw sewage, existed due to a lack of public water and sewer, yet Biloxi allows those health hazards to remain in existence within the city without a plan to fully resolve them. The chancellor also relied on testimony regarding the impact of Biloxi's failures. The chancellor found that Biloxi "has failed to extend municipal water and sewer services into the Woolmarket Area it annexed in 1999. The city blames its failures on Hurricane Katrina, although the same hurricane impacted D'Iberville, yet D'Iberville was able to meet its commitments to its area annexed in 2004." The chancellor further found that Biloxi similarly failed to keep promises regarding sewer services in the 2004 Wells Ferry annexation. The chancellor emphasized that Biloxi's past performance with regard to water

46

and sewer, "while extremely concerning to this Court, cannot in and of themselves defeat the total effort to annex." However, the chancellor noted that "it certainly weighs heavy on the heart and mind of this Chancellor." He concluded that the evidence "shows at least some effort in this area to keep [Biloxi's] commitments, but [it] has a long way to go at this date. If, in fact, the only issue in an annexation case is whether or not the past history of sewer and water is timely supplied, this Court would have to say Biloxi did not do a very good job. However, this Court is of the opinion that while it is extremely imparted [sic], standing alone this does not sound the death knell to the total annexation issue. This is especially true when a portion of the work was done." He concluded that Biloxi's "overall good record of past performance in the delivery of municipal level services and improvements to previously annexed areas" allowed him to weigh this indicium in favor of Biloxi annexing the Biloxi Critical Area.

¶126. The chancellor noted that D'Iberville's performance of municipal services was adequate.

¶127. D'Iberville argues that the chancellor's findings of facts regarding Biloxi's past performance were correct, but that he ultimately "failed to properly evaluate them under the totality of the circumstances." It argues that since D'Iberville has met past promises, these findings support D'Iberville annexing the entire PAA. Biloxi emphasizes the chancellor's findings that it has done an overall good job with respect to past performance. Biloxi also argues that it never committed to provide water and sewer to 100% of the Woolmarket area within five years. It points to a twenty-five-year plan, which it maintains is "years ahead of schedule." Biloxi also blames Hurricane Katrina's destruction of infrastructure as a severe

47

hindrance to its performance. Further, Biloxi argues that, because D'Iberville is a young city, it has largely relied on Harrison County and other entities to provide basic municipal services within its boundaries. It argues that the chancellor erred in relying only on D'Iberville's past performance with regard to water and sewer services, and that he should have looked at past performance in other areas, as well. It then illustrates the length of time after incorporation that D'Iberville took to provide certain municipal services without relying on other entities.

¶128. In 2004, this Court noted that, although D'Iberville is a young city, "[t]he services provided to D'Iberville's current residents provide proof of its abilities." *City of D'Iberville*, 867 So. 2d at 258. Neither this Court in 2004, nor the chancellor in this case, took issue with D'Iberville relying on Harrison County for some municipal services for any length of time while it established its own. It is undisputed that, at the time of the trial, D'Iberville was providing its residents with its own municipal services.

¶129. Furthermore, the chancellor very thoroughly and thoughtfully examined Biloxi's past performance, including deficiencies. After a lengthy discussion, the chancellor noted that Biloxi had met most, but not all, of its promises. The chancellor expressed his concern regarding the commitments left unfulfilled, but ultimately concluded that awarding the Biloxi Critical Area to Biloxi was reasonable, despite some unfulfilled past commitments. The chancellor notably reduced the area awarded to Biloxi from the entire PAA requested to a smaller, approximately 2.5 square-mile area.

¶130. All twelve factors pertinent to the reasonableness of a proposed annexation must be considered by the trial court, but "*no one factor is dispositive of reasonableness.*" *City of Jackson*, 16 So. 3d at 692 (emphasis added). In *City of Jackson*, this Court noted the

48

chancellor's findings that Jackson had a poor record of past performance, and found that "[t]he record supports the chancellor's finding that Jackson failed to present sufficient evidence to support this indicium." *Id.* at 689-90. Yet, this Court ultimately upheld the chancellor's decision to grant Jackson's annexation of a reduced area. *Id.* at 692. Likewise, in this case, the chancellor did not manifestly err in his ultimate determination under the totality of the circumstances to award each city a reduced area, despite the evidence of Biloxi's past deficiencies, especially considering that the chancellor found Biloxi to have an overall good record of past performance.

### 9. Impact on Residents and Property Owners in PAA

¶131. The chancellor noted that residents of the Biloxi Critical Area will receive many benefits upon annexation by Biloxi. He pointed to the immediate receipt of full-time, professional fire protection services rated a Class Five, a ratings improvement over the current Class Eight that will significantly lower homeowners' insurance premiums in the Biloxi Critical Area. They will also receive the benefits of enhanced police protection and radar enforcement of speeding violations. Further, they will receive access to city services and facilities, city zoning and planning, a discount on flood insurance premiums due to Biloxi's Community Rating System rating, and a discount on homeowners' insurance premiums due to Biloxi's Class Four Building Department rating. The chancellor relied on expert testimony that the financial increase on property owners would be minimal, ranging from $188 to $402 per year for a person owning a $100,000 house and a $30,000 automobile. Thus, the chancellor found that the financial impact upon those in the Biloxi Critical Area would be minimal in contrast to the benefits received, and that this factor weighed in favor

49

of annexation by Biloxi. The chancellor noted that D'Iberville provided adequate municipal services, and noted that D'Iberville's fire rating would likewise provide a decrease in homeowner's insurance premiums. The chancellor also noted that Harrison County provides many adequate municipal-level services to the PAA.

¶132. D'Iberville again emphasizes Biloxi's past performance in the area of utilities and argues that "there is no assurance that these citizens will get what they pay for." D'Iberville then argues that the chancellor's findings with regard to this indicium are inconsistent, stating that the chancellor found that Harrison County already provides municipal-level service to the PAA, yet also concluded that residents would receive multiple benefits from annexation. Biloxi argues that the facts supporting its annexation of the Biloxi Critical Area support its annexation of the entire PAA.

¶133. "The mere fact that residents and landowners will have to start paying city property taxes is not sufficient to show unreasonableness." *City of D'Iberville*, 867 So. 2d at 258 (internal quotations omitted). The chancellor noted many times throughout his opinion that water and sewer would be of benefit to the PAA, and further noted that annexation by either city would reduce homeowners' insurance due to improved fire ratings. The chancellor's arguably contradictory findings on this issue do not render his decision manifestly wrong under the totality of the circumstances.

### 10. Impact on Voting Strength of Protected Minority Groups

¶134. The chancellor concluded that the evidence on this factor was inconclusive, given Hurricane Katrina's impact and the fact that the best available census numbers were from 2000.

50

¶135.  Both cities argue that the determination that this is a neutral indicium supports their annexation of the entire PAA.  It is difficult to understand why a neutral indicium supports either city over the other.  The chancellor's decision to grant each city a reduced area is not manifestly wrong.  Further, "this indicium should not generally be afforded great weight in those cases where it is not raised by a party with standing."  **City of Jackson**, 16 So. 3d at 690.  No minority objectors raised this issue.

**11. Whether Benefits of the Municipality Are Enjoyed by Residents of PAA Without Paying Their Fair Share of Taxes.**

¶136.  The chancellor, relying on expert testimony, found that residents of the Biloxi Critical Area reap the benefits of Biloxi services, employment, shopping, and recreational opportunities without paying their fair share of taxes to support these benefits.  He later noted that 17,005 people commute into Biloxi.[7]  Thus, he reasoned, this factor supports annexation by Biloxi. The chancellor also noted that increased shopping and related employment opportunities exist in D'Iberville adjacent to the PAA.

¶137.  The chancellor ultimately concluded that this factor was neutral, given the fact that the PAA's citizens received no more benefit from their proximity to Biloxi and/or D'Iberville than any other citizen might receive from living close to a city.  He noted that nothing has changed regarding this factor since this Court's 2004 decision affirming the chancellor's findings that this factor was neutral and that any benefits received by outside residents were counteracted by those outside residents paying sales tax when shopping inside the cities. *See City of D'Iberville*, 867 So. 2d at 259.

_____

[7]In contrast, 1,270 people commute *out* of D'Iberville.

51

¶138. D'Iberville argues that the chancellor's conclusion that this factor is neutral contradicts his conclusions regarding the Biloxi Critical Area and his findings regarding D'Iberville. It seems to argue that the chancellor's repetition of Harrison County's argument (stating "Harrison County contends that this factor does not support annexation by either city") is the chancellor's direct finding. It then argues that this indicium either favors D'Iberville, or is neutral, and points to the chancellor's reliance on D'Iberville's facilities plan. Biloxi argues that the facts supporting its annexation of the Biloxi Critical Area likewise support its annexation of the entire PAA.

¶139. D'Iberville's argument that the chancellor's repetition of Harrison County's argument renders his findings inconsistent is unavailing. Rather, the chancellor specifically found that nothing had changed regarding this indicium since this Court's 2004 opinion confirming its neutrality, save additional shopping and employment opportunities in D'Iberville. *See City of D'Iberville*, 867 So. 2d at 259. Thus, the chancellor's finding that this factor is neutral is supported by substantial evidence.

**12. Any Other Factors**

¶140. The chancellor stated that Biloxi "is an economic engine for the region." The chancellor also noted that, were D'Iberville to annex the entire PAA, significant confusion could arise with travel on the new Highway 67 corridor, as people would alternately enter Biloxi, then D'Iberville, then Biloxi again, then D'Iberville again, then ultimately Biloxi. The chancellor opined that such a configuration made little sense from a planning perspective and was not reasonable.

¶141. D'Iberville argues that the chancellor was incorrect when he concluded that the configuration he described would cause confusion. It also argues that the chancellor's ruling was inconsistent, as he found that the PAA was rural and undeveloped and that annexation by either city would block the other's growth. Biloxi argues that D'Iberville's annexation of the entire PAA would restrict Biloxi's northern growth and cut off Biloxi's access to Highway 67, which leads directly into the heart of Biloxi. It also claims that annexation by D'Iberville would have a negative effect on D'Iberville's current citizens, due to the cost to extend the water and sewer infrastructure into the PAA.

¶142. Whether Biloxi is an economic engine for the region is an appropriate factor for the chancellor to consider. *See* **City of Jackson**, 16 So. 3d at 691-92. Further, the chancellor's determination that an annexation of the PAA in its entirety by D'Iberville would render Highway 67's passage through the cities illogical is not manifestly wrong.

**Totality of the Circumstances**

¶143. The chancellor found that, considering both financial reasons and the ability to provide municipal services, annexation of the entire PAA by either city was unreasonable. This determination is supported by substantial evidence and thus is not manifestly in error. He further engaged in a lengthy analysis of all the twelve indicia, and determined that each city should be awarded an approximately 2.5 square-mile area to meet its need to expand. He relied heavily on the changing nature of the cities' growth due to the ramifications of Hurricane Katrina to support the reasonableness of the annexations. The chancellor's findings are supported by substantial evidence, thus the chancellor did not manifestly err in

his ultimate determination that, under the totality of the circumstances, the respective annexations of the Biloxi Critical Area by Biloxi and the DAA by D'Iberville are reasonable.

## CONCLUSION

¶144. Under the specific facts of this case, this Court finds that Biloxi lacks standing to raise the jurisdiction issue, and it further waived its jurisdiction argument by its failure to raise it in the trial court. Thus, we decline to address Biloxi's jurisdiction argument. This Court affirms the chancellor's decision to award Biloxi the Biloxi Critical Area and D'Iberville the DAA. Under the totality of the circumstances, the chancellor did not manifestly err in his determination, especially in light of the changing nature of growth and development on the Gulf Coast after the devastation and attendant challenges caused by Hurricane Katrina, and each city's new-found needs to accommodate such growth and development.

¶145. **AFFIRMED.**

**WALLER, C.J., DICKINSON AND RANDOLPH, P.JJ., LAMAR, KITCHENS, CHANDLER AND COLEMAN, JJ., CONCUR. PIERCE, J., NOT PARTICIPATING.**